**Mary RUSH, Personal Representative of the Derrinesha Clay Estate, Plaintiff–Appellee,**

v.

**CITY OF LANSING, Defendant,**

**Officer Brian Rendon, Defendant–Appellant.**

No. 15–1225.

United States Court of Appeals, Sixth Circuit.

Feb. 29, 2016.

BEFORE: BATCHELDER, McKEAGUE, and STRANCH, Circuit Judges.

## OPINION

McKEAGUE, Circuit Judge.

Three Lansing Police Department officers responded to an early morning alarm at a bank and found Derrinesha Clay hid-

ing in a storage closet armed with scissors. Officers Brian Rendon and Jillian Johnson struggled with Clay and eventually got the scissors away from her, but Clay drew a knife and slashed at Rendon. While backing away, Rendon shot Clay twice, first in the stomach and then in the head. Clay died from her wounds, and Mary Rush, the representative of Clay's estate, sued the City of Lansing and Officer Rendon for violating Clay's civil rights. The district court denied summary judgment to Rendon, holding that he was not entitled to qualified immunity because there is a genuine dispute of material fact about whether it was reasonable for Rendon to fire the second shot. But qualified immunity is intended to protect officers in situations where they must make split-second, life-or-death decisions, and based on the record evidence, we conclude as a matter of law that Officer Rendon's actions were not objectively unreasonable. Accordingly, we reverse.

## I

In the early morning on March 14, 2011, Officers Brian Rendon, Jillian Johnson, and David Burke of the Lansing Police Department responded to an alarm call from a local bank. *Rush v. City of Lansing*, No. 13–CV–1317, 2015 WL 632321, at *1 (W.D.Mich. Feb. 13, 2015). Once inside the bank, Johnson and Rendon approached a storage room behind the teller counter, declared that they were the police, and ordered anyone in the storage room to come out with their hands up. *Id.* The officers discovered Derrinesha Clay, a "very small" seventeen-year-old woman, hiding inside the room. *Id.* at *1–2.

Officer Rendon, gun drawn, noticed that Clay was holding and waving a pair of scissors and forced her to the ground while holstering his gun. *Id.* at *2. Officer Johnson attempted to pry the scissors from Clay's hand, and both Rendon and Johnson ordered Clay to let go of the scissors. *Id.* Clay rose to her knees while still holding and waving the scissors and moved toward Rendon. *Id.* Johnson testified that Clay "was frantic, shaking, and saying 'I'm sorry, I'm sorry.'" *Id.* After a struggle between Johnson, Rendon, and Clay, Johnson was able to get the scissors out of Clay's hand. *Id.* At that point, Johnson was in the storage room behind Clay, Rendon was at the door's threshold, facing Clay, and Burke was just outside the room, one to two feet to the side of Rendon. *Id.*

After Johnson forced the scissors away from Clay, Rendon was standing in the doorway with one hand on Clay's shoulder when Clay pulled a serrated steak knife from her coat. *Id.* Rendon yelled "knife," Johnson backed away from Clay, and Clay, still kneeling, slashed the knife back and forth at Rendon at stomach height from about an arm's length away. *Id.* at *2–3. Rendon let go of Clay's shoulder, stepped backwards out of the room, pulled his gun from its holster, and fired one shot into Clay's stomach. *Id.* at *3. After the shot, Rendon was just out of arm's reach from Clay. *Id.*

The officers' testimony varies as to Clay's reaction to Rendon's first shot. In Rendon's deposition, he testified that he shot Clay in the stomach, "[a]nd then right simultaneously when I shot her in the stomach area she lunged at me with the knife, and I shot her again." R. 29–3, Rendon Dep. at 48, Page ID 333. When questioned further, he confirmed that Clay lunged again *after* the first shot. Officers Johnson and Burke, however, testified that Clay did *not* lunge at Rendon after the first shot. Johnson testified that Clay's body "tensed up and fell backwards after the first shot." *Rush*, 2015 WL 632321, at *3. Burke testified that Clay "slouched

over" after the first shot. *Id.* But all three officers agreed that Rendon then fired his weapon a second time, shooting Clay in the head—a wound that proved fatal. *Id.*

Although the district court made no mention of the time between shots, all three officers also agreed that Rendon's two shots occurred very close together in time. Officer Johnson gave the following testimony in her deposition:

A: As I stood up, I pulled my firearm out. As I got it up, I heard two shots.

\* \* \* \*

A: *It all kind of happened at the same time.* She—I want to say her whole body just kind of tensed up and went backwards.

Q: And that's when you heard a second shot?

A: Yes. *The two shots were very close together.*

R. 29–2, Johnson Dep. at 35–36, Page ID 262–63 (emphasis added). In the police report, Johnson stated in her first interview that "the noise of the gunshots were close to one another" and that "at the time that she drew her weapon, was the exact same time as when she heard the two gunshots." R. 31–2, Police Rep. at 5, Page ID 436. And in the follow-up interview for the report, she stated that the shots were "immediate and there was no lapse of time between the first and second gun shot[s]." *Id.* at 7, Page ID 438.

Officer Burke did not discuss the time between shots in his deposition, but in his initial interview for the police report he stated that Rendon "drew his weapon and fire[d] two shots at the suspect . . . the shots were one after the other." *Id.* at 8, Page ID 439. He reiterated this in the follow-up interview, stating that "the two shots that Rendon fired were quick and immediate." *Id.* at 10, Page ID 441.

Officer Rendon's testimony aligns with the other officers'. In his interview for the police report, Rendon stated that "he drew his gun, and he fired, and then he fired again." *Id.* at 12, Page ID 443. At his deposition, he testified: "And then I shot her in the stomach area. And then right simultaneously when I shot her in the stomach area she lunged at me with the knife, and I shot her again." R. 29–3, Rendon Dep. at 49, Page ID 333.

Mary Rush, acting on behalf of Clay's estate, sued Officer Rendon and the City of Lansing. The only claim on appeal is Rush's claim, under 42 U.S.C. § 1983, that Rendon used excessive force in firing the second shot. The district court denied Rendon's motion for summary judgment, holding there is a genuine dispute of material fact about whether it was objectively unreasonable for Rendon to fire the second shot, as the evidence did not establish that Clay continued to pose a significant threat after the first shot. Officer Rendon timely appealed.

## II

█ As a threshold matter, we must address whether we even have jurisdiction to hear this appeal. As a general rule, the denial of summary judgment is not immediately appealable because it is not a final decision within the meaning of 28 U.S.C. § 1291. *DiLuzio v. Village of Yorkville, Ohio,* 796 F.3d 604, 609 (6th Cir.2015). However, the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [ ] § 1291 notwithstanding the absence of a final judgment." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

We have jurisdiction to decide an appeal challenging the district court's legal deter-

mination that the defendant violated a constitutional right or that the right was clearly established. *Mitchell*, 472 U.S. at 530, 105 S.Ct. 2806. We may also decide an appeal challenging a legal aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence. *See Plumhoff v. Rickard*, —— U.S. ——, 134 S.Ct. 2012, 2019, 188 L.Ed.2d 1056 (2014). But we may not decide an appeal challenging the district court's determination of "evidence sufficiency"—facts that a party may, or may not, be able to prove at trial. *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Because such challenges are purely fact-based, they do not present purely legal questions and are therefore not appealable. *Plumhoff*, 134 S.Ct. at 2019. In other words, "we may not decide a challenge directly to the district court's determination of the record-supported evidence or the inferences it has drawn therefrom, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *DiLuzio*, 796 F.3d at 610 (citing *Roberson v. Torres,* 770 F.3d 398, 402 (6th Cir.2014)). We are permitted, however, to "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir.2005).

At times, Officer Rendon makes impermissible factual challenges. His brief on appeal notes his perception that Clay lunged at him immediately after the first shot. *See* Appellant Br. at 9. The record has three conflicting versions of Clay's reaction to the first shot: she either (a) lunged at Rendon (Rendon's testimony); (b) fell backward (Johnson's testimony); or (c) slouched forward (Burke's testimony). If Rendon's arguments required us to ac-

cept his version of Clay's reaction, we could not consider them. But Rendon clarified that his legal arguments are *not* based on his version of the facts, and explicitly says as much in his briefing: "The undisputed material facts in this case make clear that the interval between shots was a matter of seconds, and the movement of Clay's body—*whether forwards or back*—was not sufficient to make clear to Officer Rendon that she no longer caused a threat." Reply Br. at 8 (emphasis added). Thus, because Rendon's legal argument is not premised on accepting only his description of Clay's reaction, nothing prevents us from answering the legal question before us.

We must also consider whether the major premise of Officer Rendon's argument—that the shots were fired so close together that it was not unreasonable for him to fire the second shot—is an impermissible fact-based challenge. The district court omitted any discussion or analysis of the time between Rendon's first and second shots, and "because we defer to the district court's factual determinations, ideally we need look no further than the district court's opinion for the facts and inferences cited expressly therein." *DiLuzio*, 796 F.3d at 611. However, we also explained in *DiLuzio* that, in making an argument on appeal, "the defendant-appellant may—indeed, for some arguments, must—point to some other of the plaintiff's record evidence, or some incontrovertible record evidence, to support that argument." *Id.* We must make "the *legal* determination of whether the defendant violated a clearly established right, based on those now (for this purpose) undisputed record facts, i.e., 'once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record.*'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372,

381 n. 8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). So, "while we need not engage in a plenary review of the record, neither are we limited to only the facts, evidence, or inferences that the district court has stated expressly." *Id.*

Officer Rendon's legal argument that he did not violate a clearly established constitutional right because "the shots were fired in such close proximity in time that [he] lacked time to re-evaluate the situation and conclude that deadly force was no longer justified" is not an impermissible fact-based challenge to the district court's decision. Appellant Br. at 22. The district court made no factual findings regarding the time between shots, so Rendon cannot be challenging a (non-existent) factual determination of the district court. And we are not prohibited from examining the record regarding the amount of time between shots simply because the district court did not mention it. *See DiLuzio,* 796 F.3d at 611; *see also Chappell v. City of Cleveland,* 585 F.3d 901, 910 (6th Cir.2009) (taking into account "relevant facts, as disclosed in the record," even though the district court did not mention them). In this case, as in *Chappell,* the district court's "summary of the extant record is accurate, but incomplete. Also relevant and undisputed, but ... lacking from this summary, is the consistent testimony of [the] officers" regarding a key fact—here, the amount of time between Officer Rendon's first and second shots. *Chappell,* 585 F.3d at 910.

All three officers stated that Rendon's two shots occurred very close together in time. Based on this consistent, uncontroverted evidence in the record, Rendon's legal argument is not an impermissible fact-based challenge. The key events occurred in the following sequence: (1) Clay pulled out a knife and slashed at Rendon; (2) Rendon shot Clay in the stomach; (3) Clay had some reaction (fell back, slumped forward, or lunged again at Rendon); and (4) Rendon shot Clay in the head. Rendon does not dispute that the two shots occurred separately, nor does he dispute the factual sequence of events. He simply argues that, based on the undisputed facts, his actions were not unreasonable.

Whether the two shots were, in the officers' words, "almost simultaneous," "in quick succession," "very close together," "immediate and there was no lapse of time," or "quick and immediate," the record contains numerous, consistent statements from all three officers showing that there was very little time between shots. This is uncontroverted record evidence, and Officer Rendon is not prohibited from making a legal argument based on the evidence in the record, so long as it is viewed in the light most favorable to Rush. Semantic differences in these words and phrases aside, and even viewed most favorably to Rush, there is no question that the evidence shows the shots occurred very close together. Because Officer Rendon's legal argument is based on the facts in the record, taken in the light most favorable to Rush, we have jurisdiction over this appeal, and the facts we take into account can—indeed, must—include that Officer Rendon's two shots occurred very close together in time.

### III

To determine whether an officer is entitled to qualified immunity, we apply a two-prong test: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins v. Cyranek,* 805 F.3d 760, 765 (6th Cir.2015)

(quoting *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151 (2001)). The order in which we analyze these two prongs is left to our "sound discretion." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *see also Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015).

**A**

Under the first prong, we must determine whether Officer Rendon's use of deadly force was unreasonable so as to violate Clay's Fourth Amendment right to be free from excessive force. *See Mullins*, 805 F.3d at 765.

■ Rush first argues that Rendon's first shot was unreasonable and thus a constitutional violation. Rush did not raise this argument in the district court, and as a general rule we do not consider new arguments presented for the first time on appeal. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir.2002). Regardless, her argument is wholly unpersuasive. Immediately before Rendon fired the first shot, Clay drew a knife and slashed at Rendon from an arm's length away. Under those circumstances, it was not unreasonable for Rendon to use deadly force by shooting at Clay. *See Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (establishing that law enforcement officers may employ deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others).

Turning to the second shot, we generally apply three non-exhaustive factors to guide our evaluation of whether an officer's actions were reasonable: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting

arrest or attempting to evade arrest by flight." *Mullins*, 805 F.3d at 765 (internal quotation marks and citation omitted).

When examining these factors, the key question is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). As we recently explained:

> We must judge the reasonableness of the use of force from the perspective of a reasonable officer on the scene and not through the lens of 20/20 hindsight, allowing for the fact "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

*Mullins*, 805 F.3d at 765–66 (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865). "After all, what constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Id.* at 766 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir.1996) (quotation marks omitted)).

■ Because it is undisputed that the crime of breaking and entering into a bank while armed—not to mention assaulting an officer with a knife—is sufficiently severe to support the use of force, the first factor weighs in Rendon's favor. Accordingly, we turn to the second factor and evaluate the threat posed by Clay. We measure the reasonableness of the force used at a particular time based on an "objective assessment of the danger a suspect poses at that moment." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir.2007). Given the

reasonableness of Rendon's use of deadly force in firing the first shot, the question is thus whether it was objectively unreasonable for Officer Rendon to continue to use deadly force by firing the second shot. Rendon argues that the two shots were fired so close together that he lacked time to determine that deadly force was no longer justified.

"[Q]ualified immunity is available only where officers make split-second decisions in the face of serious physical threats to themselves and others." *Mullins*, 805 F.3d at 766–67 (citations omitted). However, the fact that a situation unfolds quickly "does not, by itself, permit [officers] to use deadly force." *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir.2005). The district court segmented the shooting, noting that courts "look to the split second before the officer had to decide what to do," in finding that Clay did not pose a threat just prior to the second shot. *Rush*, 2015 WL 632321, at *6 (quoting *Dickerson*, 101 F.3d at 1161–62). However, we have previously held that "[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir.2005). This is so because "[q]ualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violate the law." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir.2015), cert. denied, —— U.S. ——, 136 S.Ct. 217, 193 L.Ed.2d 130 (2015) (citation omitted); *see also Chappell*, 585 F.3d at 907 (citing *Pearson*, 555 U.S. at 231, 129 S.Ct. 808) ("Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.").

In the time since the district court issued its decision, we decided two cases clarifying Sixth Circuit law with regard to the reasonableness of deadly force. *See, e.g., Mullins*, 805 F.3d 760; *Pollard*, 780 F.3d 395. *Mullins*, in particular, is persuasive here, as we held that it was not unreasonable for an officer to fire two shots in the five seconds *after* a suspect was no longer a threat. *See Mullins*, 805 F.3d at 768. In *Mullins*, an officer pushed a man he suspected of illegally carrying a gun to the ground, where the suspect eventually brandished a gun. *Id.* at 763. The officer, still pinning the suspect to the ground, told him to drop the gun, and in response the suspect threw the gun over the officer's shoulder. *Id.* The officer then fired two shots at the suspect, killing him. *Id.* at 764. The two shots came in the five seconds after the suspect threw away the gun, with the second shot coming two seconds after the first. *Id.* Yet we affirmed the district court's decision to grant qualified immunity to the officer, holding that the officer's actions were not unreasonable. That reasoning is applicable here.

*Mullins* was "not a case where 'a jury could conclude that [the officer] was not in any danger in the first place.' " *Id.* at 767 (quoting *Smith*, 430 F.3d at 775). The suspect in *Mullins* had his finger on the trigger of a gun, posing a significant threat to the officer and others. *Id.* at 767. We thus reasoned that "[w]hile [the officer]'s decision to shoot [the suspect] after he threw his weapon away may appear unreasonable in the 'sanitized world of our imagination,' [the officer] was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable." *Id.* (quoting *Dickerson*, 101 F.3d at 1163). We concluded, based on a host of cases from various circuits, that "[w]hile hindsight reveals that [the sus-

pect] was no longer a threat when he was shot," officers should not be denied qualified immunity "in situations where they are faced with a threat of severe injury or death and must make split-second decisions, albeit ultimately mistaken decisions, about the amount of force necessary to subdue such a threat." *Id.* at 767–68 (collecting cases).

We also explained in *Mullins* that "[o]ur reasoning applies equally to both shots" fired by the officer. *Id.* at 768. The second shot "came within the time frame in which a reasonable officer could have acted under the perception that [the suspect] was still armed." *Id.* (citing *Untalan*, 430 F.3d at 315). And we had previously held that an officer was entitled to qualified immunity where he shot the suspect seven times even *after* the suspect had been brought down by another officer's shot. *Boyd v. Baeppler*, 215 F.3d 594, 602–04 (6th Cir.2000). We concluded that "*Boyd* and *Untalan* thus combine to answer any question about the reasonableness of [the officer]'s second shot." *Mullins*, 805 F.3d at 768.

Turning to this case, once the relevant facts are determined and all reasonable inferences are drawn in favor of the plaintiff, "the question whether the [officer]'s actions were objectively unreasonable is a 'pure question of law.' " *Chappell*, 585 F.3d at 909 (quoting *Scott*, 550 U.S. at 381 n. 8, 127 S.Ct. 1769).[1] The district court based its conclusion that Clay no longer posed a threat, and that therefore Officer Rendon's actions were objectively unreasonable, on a number of facts. Clay was "very small," approximately 5'4" and 125 pounds, and was seventeen years old. She was on her knees and about a foot out of arm's reach.

She had just been shot in the stomach, and the police outnumbered her three-to-one. Following the first shot, Clay moved either forward or backward, but made no further moves to stab or injure any of the officers.

But that is not all the record shows. The officers were in a confined space (a small room in a dark bank) with Clay. The second shot occurred just after Clay unquestionably *did* pose a threat by slashing at Rendon with a knife, and the second shot occurred very shortly after the first. Whether Clay slumped forward or backward following the first shot, there was no clear or unmistakable surrender, or any other action that would compellingly show that the threat had abated. Moreover, Clay's assault with the knife—a knife she produced unexpectedly from inside her coat—occurred after the officers had subdued and apparently disarmed her of her scissors from her first assault, and was accompanied by her misleading pleas of "I'm sorry, I'm sorry." Taking all of the record facts into account, Rendon was justified in remaining apprehensive of further deception and threat from Clay. Thus, it was not unreasonable for Officer Rendon to continue using deadly force.

The district court found that there was a genuine dispute as to whether Clay continued to pose a threat of serious physical harm after Officer Rendon's first shot. Fair enough, but the question before us is not whether Clay stopped posing a threat in the short time between shots, viewed in the "sanitized world of our imagination." *Dickerson*, 101 F.3d at 1163 (citation omitted). The question is whether Officer Rendon's assessment that Clay still posed a threat was unreasonable under the circumstances. Taking all of the record facts

---

1. While the dissent would leave this question for the jury, the Supreme Court has "reject[ed] the argument that the question of objective reasonableness is 'a question of fact best reserved for a jury.' " *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir.2008) (quoting *Scott*, 550 U.S. at 381 n. 8, 127 S.Ct. 1769).

into account, the "second shot did not come at a time after which a reasonable officer would think the threat had passed." *Mullins*, 805 F.3d at 768. Accordingly, the second factor favors Rendon.

The third factor—whether the suspect was actively resisting arrest—follows the second and also favors Rendon: Clay was actively resisting arrest right up to the first shot, and it was certainly reasonable for Officer Rendon to expect her to continue to do so.

Based on the record evidence, it was not unreasonable for Rendon to perceive Clay as still posing a threat when he fired the second shot, even if he was ultimately mistaken in making a split-second assessment. We therefore hold that Rendon's use of deadly force was not objectively unreasonable under the circumstances and that no constitutional violation occurred.

**B**

■ The "clearly established" prong of the qualified immunity test bolsters our conclusion. The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at 308 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011)). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Id.* "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S.Ct. at 308 (internal quotation marks and citation omitted). In *Mullenix*, the Supreme Court recently rejected the Fifth Circuit's use of the general rule that a police officer "may not use deadly force against a fleeing

felon who does not pose a sufficient threat of harm to the officer or others" as being at too high a level of generality. *Id.* at 311 (quotation marks omitted). And in *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam), the Court summarily reversed the Ninth Circuit's decision to use the rule that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Mullenix*, 136 S.Ct. at 309 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir.2003)). The Court held that the use of such a "general" test for excessive force was "mistaken." *Brosseau*, 543 U.S. at 199, 125 S.Ct. 596.

Despite this clear direction from the Supreme Court, the district court primarily relied on the general rule that deadly force is unreasonable "where the suspect poses no immediate threat to the officer and no threat to others." *Rush*, 2015 WL 632321, at *8 (quoting *Garner*, 471 U.S. at 12, 105 S.Ct. 1694). It also noted "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Id.* (quoting *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir.2006)). Finally, the district court cited one of our unpublished decisions for the proposition that it is illegal for officers to use "non-lethal, temporarily incapacitating force [ ] on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest." *Id.* (quoting *Wells v. City of Dearborn Heights*, 538 Fed.Appx. 631, 638 (6th Cir.2013)).

As the Supreme Court reiterated in *Mullenix*, "[t]he general principle that deadly force requires a sufficient threat hardly settles this matter." 136 S.Ct. at 309, 312. The cases cited by the district court and *Rush* provide only general

rules—rules just like the ones the Supreme Court has rejected in per curiam, summary reversals. *See, e.g., Mullenix,* 136 S.Ct. at 311; *Brosseau,* 543 U.S. at 199, 125 S.Ct. 596. Moreover, the right here was not clearly established in light of the many cases, including cases in our circuit, where courts have held that it was not unreasonable for officers to continue using deadly force—even mistakenly— when the officer had been faced with a severe threat in a rapidly-changing situation seconds before and the circumstances did not indicate that the threat had abated. *See, e.g., Mullins,* 805 F.3d at 767 (collecting cases).[2] Absent controlling authority, we require "a robust consensus of cases of persuasive authority" to constitute clearly established law. *al–Kidd,* 131 S.Ct. at 2084 (internal quotation marks and citation omitted). We lack controlling authority here, and any robust consensus of cases is manufactured at too high a level of generality. Accordingly, we hold that Rendon did not violate a clearly established constitutional right.

## IV

The death of Ms. Clay is a tragedy, a death that, with the benefit of hindsight, may have been avoided. Yet this case also highlights the fact that police work is dangerous work. In recognition of this dangerousness, the doctrine of qualified immunity operates to protect officers from civil liability, even for mistakes of judgment, so long as their actions are not shown to have been objectively unreasonable. Applying this doctrine to the undisputed facts of this case under controlling case law leads us to conclude that Officer Rendon's firing of two shots in quick succession was not a constitutional violation. And, in any event,

a constitutional right to be free from such a use of force was not clearly established. For the reasons set forth above, we **REVERSE** the district court's denial of Officer Rendon's motion for summary judgment and **REMAND** to the district court for entry of judgment in favor of Officer Rendon.

STRANCH, Circuit Judge, dissenting.

Derrinesha Clay was 17 years old at the time of her death. The district court found that when police officers first discovered Clay—"a very small woman at approximately 125 pounds and 5′4″ in height"—hiding in a storage closet and holding a pair of scissors, Clay "was frantic, shaking, and saying 'I'm sorry, I'm sorry.'" *Rush v. City of Lansing,* No. 13–CV–1317, 2015 WL 632321 at *1, *6 (W.D.Mich. Feb. 13, 2015). The court further found that when Officer Brian Rendon later fired a bullet into Clay's head, killing her, Clay was "on her knees more than [an] arm's length from Defendant Rendon. She had just been shot in the stomach. She was outnumbered three-to-one by the police." *Id.* at *6. And, "[a]ccording to two police officers," she "made no sudden moves to stab or otherwise injure an officer or herself." *Id.* Officer Rendon testified, by contrast, that after he shot Clay in the stomach she lunged at him with a knife which is why he shot her a second time. *See id.* at *7.

The district court denied Officer Rendon qualified immunity based on these facts, holding that a reasonable jury could "conclude that Defendant Rendon's shot to Ms. Clay's head was unreasonable because she was on her knees, she had already been shot in the stomach, and *she was no longer resisting.*" *Id.* at *8 (emphasis added). I

---

**2.** *Mullins* itself cannot be used to determine whether the right was clearly established because it was decided well after the events

leading to this case, but the cases cited in *Mullins* were all decided before 2011 and therefore apply.

agree with the district court that factual disputes over the reasonableness of Officer Rendon's use of deadly force render summary judgment inappropriate in this case. *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir.1998) ("When 'the legal question ... is completely dependent upon which view of the facts is accepted by the jury,' the District Court cannot grant a defendant police officer immunity from a deadly force claim." (alteration in original) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir.1989))). I therefore respectfully dissent.

Qualified immunity is designed to balance "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Accordingly, courts "make[ ] two inquiries when resolving qualified immunity claims: (1) whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir.2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Our circuit has held that "whether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment[,]" and that such an "assessment requires asking whether the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir.2007) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694,

85 L.Ed.2d 1 (1985)). We analyze probable cause in this context by looking to three factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.*

With respect to the first factor, it is undisputed that the crime of breaking and entering into a bank while armed is sufficiently severe to support the use of force. The second and third factors, however, are a different story. As the district court observed with respect to the second factor, there is at least "a genuine dispute [regarding] whether Ms. Clay"—who was on her knees more than an arm's length away from Rendon—"continued to pose a threat of serious physical harm after Defendant Rendon shot her in the stomach." *Rush*, 2015 WL 632321 at *7. And, as for the third factor, the record evidence viewed in the light most favorable to plaintiff does not support a finding that Clay was actively resisting or attempting to flee at the time of the second shot. Indeed, the district court expressly concluded that Clay "was no longer resisting" when Officer Rendon fired the fatal bullet. *Id.* at *8. Consequently, our precedent counsels that Officer Rendon may have lacked probable cause to use lethal force and, thus, that plaintiff has alleged a violation of Clay's constitutional right to be free from excessive force. *See Sova*, 142 F.3d at 903.

As for the second step of our qualified immunity analysis—whether the right at issue was clearly established at the time of the alleged violation—we have long held that "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003). Here, the relevant inquiry

is whether it was clearly established that the use of deadly force was unreasonable in the circumstances that Officer Rendon faced: a suspect holding a knife—but on her knees more than an arm's length away—who had initially struggled but had since suffered a gunshot wound to the stomach and was neither trying to inflict harm nor attempting to flee. *See Mullenix v. Luna,* —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015). This court has previously denied qualified immunity to officers who used lethal force in situations where armed suspects not only struggled with officers but then also attempted to flee. *See, e.g., Bouggess,* 482 F.3d at 896. Indeed, in *Bouggess v. Mattingly,* we held that "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of physical harm to him or others, deadly force is *not* justified." *Id.* (emphasis in original). I am therefore inclined to agree with the district court in the present case that, construing the facts in the light most favorable to plaintiff, as we must, any reasonable officer would have known that shooting Clay in the head when she did not pose an immediate threat and was not actively resisting violated her right to be free from excessive force.

Finally, our circuit recognizes that in the "typical" qualified immunity case, "we defer to the district court's factual determinations" and "ideally ... look no further than the district court's opinion for the facts and inferences cited expressly therein." *DiLuzio v. Vill. of Yorkville,* 796 F.3d 604, 609 n. 1 & 611 (6th Cir.2015). Derrinesha Clay is not alive to contest the timing of the two shots Officer Rendon fired into her body. And the district court declined to draw any inferences in Officer Rendon's favor based on his and his fellow officers' testimony that the two gunshots were very close together, determining instead that there existed disputes of materi-al fact among the officers regarding Clay's actions in the time intervening between the shots. The district court's approach adheres to our precedent, which holds that when determining qualified immunity in cases where the witness most likely to contradict a defendant officer's story is the person shot dead, we " 'may not simply accept what may be a self-serving account by the police officer.' " *Jefferson v. Lewis,* 594 F.3d 454, 462 (6th Cir.2010) (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)). Instead, we " 'must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story[.]' " *Id.* Some of the evidence tending to discredit Officer Rendon's account of Clay's threatening behavior comes from his fellow police officers present at the scene. On this record, I would defer to the district court's determination that summary judgment is inappropriate in this case.