NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0544n.06

No. 17-4112

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

TONI STAHL, individually and as Administratrix of the Estate on behalf of David W. Stahl, II,

      **Plaintiff-Appellant,**

v.

COSHOCTON COUNTY; DANE SHYROCK, Coshocton County Commissioner; D. CURTIS LEE, Coshocton County Commissioner; OFFICER TIMOTHY L. ROGERS; LIEUTENANT DEAN O. HETTINGER; SERGEANT CHARLES GEORGE; DEPUTY ERNEST E. SNYDER; DEPUTY DAVID STONE; DEPUTY MARK SHARROCK; DEPUTY SETH ANDREWS; DETECTIVE J. BRENT MCKEE; KACIE DIEBEL, Dispatcher; BERNARD JOSEPH MINET, Coshocton County Emergency Medical Services Director; TODD ALLEN SHROYER CCEMS Assistant Director; TRAVIS J. WILLIAMS, Paramedic; DANIEL S. REEDY, Paramedic; JENNIFER J. HETTINGER, Paramedic; JENNIFER J. KENWORTHY, EMT; GARY L. FISHER, Coshocton County Commissioner,

      **Defendants-Appellees.**

</td><td>

**FILED**
Oct 31, 2018
DEBORAH S. HUNT, Clerk

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO**

**OPINION**

</td></tr>
</table>

BEFORE: NORRIS, DONALD, and BUSH, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.** Plaintiff Toni Stahl filed suit on behalf of her deceased son, David W. Stahl, II, in her capacity as the administratrix of his estate. The complaint named Coshocton County, Ohio, and several of its county commissioners, sheriff's department employees, and emergency medical personnel as defendants. The suit arose from the shooting death of her son by Deputy Ernest Snyder. Among other things, the complaint alleged that

defendants violated her son's constitutional rights when they used excessive force to unlawfully seize him, and were then deliberately indifferent to his serious medical needs. The district court entered judgment in favor of defendants with respect to the federal causes of action. It declined to exercise jurisdiction over the Ohio law claims and dismissed them without prejudice. *Stahl v. Coshocton Cty., Ohio*, No. 2:15-cv-572, 2017 WL 6508384 (S.D. Ohio Sep. 22, 2017). This appeal followed.

## I.

The unfortunate events that led to Stahl's death occurred on March 26, 2013, and began in the village of New Concord, Ohio. According to the sworn declaration of New Concord police officer Jeremy Downing, he was sitting in his cruisier at 9:20 in the evening when a red and tan pick-up truck drove through a red light. Downing pursued the truck and turned on the cruiser's lights and siren. Rather than slow down, the truck swerved, almost hitting an on-coming vehicle and, shortly thereafter, a row of mailboxes. Downing radioed his dispatcher to report that he was in pursuit of a truck with license plate number DAU 4555, which was traveling at speeds between 60 and 80 miles per hour.

Downing's pursuit crossed into neighboring Coshocton County (New Concord is located in Muskingum County). He learned from a dispatcher that Coshocton County deputies had been advised of the situation. Downing terminated the pursuit for his own safety, expecting Coshocton County deputies to stop the truck. In all, his involvement lasted about twenty minutes.

Coshocton County deputies Seth Andrews, Mark Sharrock, Ernie Snyder, and David Stone learned of the pursuit of the pick-up at 9:38 p.m. Deputies Stone and Snyder were in the same cruiser while Andrews and Sharrock each drove his own vehicle. At 10:07, Snyder and Stone saw the truck enter the intersection of U.S. 36 and S.R. 93. The cruisers driven by Deputies Sharrock

and Snyder gave chase after confirming that the license plate number matched the one of the truck fleeing from Muskingum County. *Id.* The deputies turned on their cruisers' lights and sirens to signal the truck to pull over.

It did not. The dash camera video records Deputy Sharrock pulling his cruiser alongside of the truck. As Deputy Snyder states in his affidavit, "The suspect vehicle [did] not slow down or pull over despite the fact that one marked police cruiser with lights and sirens is right next to it and another marked police cruiser (my cruiser) is right behind it." After this maneuver failed, Deputy Sharrock pulled his cruiser in front of the truck to force it to slow down. Although the truck slowed down briefly, it did not pull over. Instead it struck Sharrock's cruiser. According to Deputy Snyder, "From my perspective, the driver of the suspect vehicle knowingly and/or intentionally hit Deputy Sharrock's cruiser because Deputy Sharrock was in front of the suspect vehicle for a good five seconds and the suspect made no effort to stop or pull over his vehicle. He also made no effort to avoid Deputy Sharrock." Deputy Sharrock described what happened next in these terms:

> I accelerated to put some distance between my cruiser and the truck. The truck then pulled into the left lane. I kept my cruiser in the right hand lane and was going to let the truck go around me;
>
> Instead of going around me, the driver of the truck swerved back into the right hand lane and turned into me violently;
>
> The truck impacted the left side of my cruiser. I lost control of my cruiser, spun, and smashed into the concrete barrier that divides the westbound and eastbound lanes of U.S. 36;
>
> Just before my cruiser impacted the wall, I distinctly remember thinking that I was going to die.

At this point, Deputy Snyder decided to initiate a "controlled contact" with the truck to get it off of the road. As Snyder puts it in his affidavit, "Controlled contact as I was trained, is intentional contact between a police vehicle and the violator's vehicle. . . . and is frequently

3

intended to cause the violator to spin out of control or to leave the roadway in a slow, but uncontrolled manner." In this case, the truck rolled down an embankment and into a field.

Deputy Snyder pulled over to the side of the road and Deputy Stone, along with a K-9 dog, got out and headed down the slope. Snyder followed shortly thereafter. According to Stone, Stahl accelerated towards him. He sidestepped the truck and ordered the driver to stop. Stone then watched as "Mr. Stahl, with both hands on the steering wheel accelerate[d] towards Deputy Snyder and I feared for the life of Deputy Snyder." Stone tried to distract Stahl by hitting the window on the driver's side with his flashlight. It failed to break the glass and Stahl continued to drive towards Snyder, who fired three shots in quick succession. Stone saw one of them hit Stahl in the head. He then observed "brain matter coming out of [Stahl's] head" and assumed that he was dead.

For his part, Snyder recalls "distinctly remember[ing] Mr. Stahl looking right at me with both hands on the steering wheel and accelerating towards me; [f]earing that I might get run over and fearing for my life, I fired at Mr. Stahl." He recalls four[1] shots "in about one second." He, too, observed "brain matter" and believed Stahl to be dead.

Meanwhile, Deputy Andrews, who had been among the deputies looking for the truck, heard Deputy Snyder radio that "shots had been fired and the suspect was down." Andrews arrived a minute later and "saw Deputy Sharrock's cruiser smashed against a concrete road divider. Deputy Sharrock was hobbling down the road (U.S. 36)."

Snyder and Stone came up the embankment and met Andrews. They then assisted Sharrock into the back of Andrews's cruiser. Paramedic Dan Reedy arrived in the interim and Andrews walked down to the truck with him. Once there, Andrews saw Stahl's arm move and realized that—

---

[1] The three shots discussed by Deputy Stone were fired through the windshield when Deputy Snyder was in front of the truck. Snyder fired a fourth through a side window.

contrary what Stone and Snyder thought—he was still alive. While Reedy was retrieving a gurney, Andrews took pictures of the scene at the direction of a recently arrived detective.

Kacie Deibel, a dispatcher with the Coshocton County Sheriff's Department, was on duty on the night in question. According to her affidavit, Deputy Snyder reported shots fired at 10:09 p.m. "Because the scene was secure, the responding medics had no reason to stage away from the scene." At 10:15, "Medic 3" reported that it was on the scene; Medic 11 arrived one minute later. Paramedic Jennifer Kenworthy, who was also a member of Medic 3, attended to Deputy Sharrock while Reedy saw to Stahl. In his affidavit, Reedy offers these recollections of the scene:

> I walked down to the truck which Mr. Stahl had been driving. I believe that Deputy Andrews and another deputy walked down with me;
>
> I saw that Mr. Stahl was moving. At that time, I took a step back while the deputies made sure there were no weapons in the car;
>
> I then assessed Mr. Stahl. Mr. Stahl was severely injured. Most seriously, he had a gunshot wound to the left side of his head with brain matter showing and he had, in my opinion, decerebrate posturing. Decerebrate posturing is an indication of severe brain injury. Mr. Stahl was unconscious;
>
> Because of his injuries and unconsciousness, I decided that it was better to get Mr. Stahl to the hospital as quickly as possible ("load and go") rather than to attempt interventional treatments in the field;
>
> I do not recall if I got the gurney and medical equipment or if another CCEMS employee got those items, but, myself and other CCEMS personnel extracted David Stahl from the truck and got him to an ambulance quickly;
>
> We transported David Stahl to Coshocton County Memorial Hospital ("CCMH") in Medic 11. I was assisted in patient care by Paramedic Travis Williams. EMT Jennifer LaVigne drove Medic 11;
>
> After listening to audio recordings of radio traffic, we left for the hospital with Mr. Stahl at 10:24 p.m.—just nine minutes after I arrived;
>
> . . . .
>
> Nobody interfered with or delayed me in treating Mr. Stahl;
>
> I do not recall the deputies taking pictures of Mr. Stahl, but, if they did, it did not interfere with or delay my care for Mr. Stahl.

5

This factual summary dovetails with that given by the district court in its opinion. Plaintiff's brief supplements this account in a number of ways. First, she notes that New Concord police officer Downing never explicitly requested that the driver of the truck be stopped. Second, thirty minutes elapsed between when Downing ceased following the truck and when Coshocton County deputies spotted it. When asked during his deposition, Deputy Snyder conceded that he could not be sure if it was Stahl who drove away from Officer Downing. Third, Deputy Snyder acknowledged that it was possible that Stahl swerved because he dropped his cell phone. Fourth, there was nothing to suggest that deadly force was needed to protect the public at the time of the shooting because the truck had gone down a relatively steep embankment and could not reenter the public roadway.

With respect to the adequacy of the medical response, plaintiff directs us to the deposition of Todd Shroyer, a supervisor with Coshocton County's EMS division. At home that evening, he overheard radio traffic and went to the scene. When he arrived, Medic 3 had already arrived and Reedy had gone down to the truck. Shroyer encountered Deputy Snyder, who told him that the driver was dead. Because he knew that Snyder was himself a paramedic, Shroyer assumed that to be true. Shroyer did not go down the embankment because Snyder told him that he only wanted one person "down there" in order not to contaminate the scene. As a result, Shroyer held Medic 11 at the top of the embankment until Reedy came back up the hill and reported that Stahl was still alive. At that point, "we took the cot down did a rapid extrication and got them [sic] out of the truck and put him in the ambulance and headed to the hospital." In the meantime, a deputy had called MedFlight, which, as its name implies, provides air transport in emergency medical situations. When a dispatcher asked Shroyer if he still wished MedFlight to respond, he canceled the request because he believed that Stahl "had injuries that in my opinion were not compatible

with life." He came to this conclusion from talking to Deputy Snyder; he did not evaluate Stahl himself.[2] Stahl was instead driven to Coshocton Memorial Hospital, which lacked a surgeon, rather than to a Trauma One Center.

Plaintiff filed a complaint on February 11, 2015. In addition to Coshocton County, it names the County Sheriff and the County's Director of Emergency Medical Services, along with many of their subordinates, as defendants. The federal causes of action, brought pursuant to § 1983, allege unlawful seizure, excessive use of force, and deliberate indifference to Stahl's serious medical needs. The complaint also includes a number of Ohio law claims.

As previously mentioned, the district court granted defendants' motion in an opinion and order. This appeal followed.

**II.**

*Standard of Review*

We review the denial of summary judgment on the grounds of qualified immunity de novo because the determination involves a question of law. *Nelson v. City of Madison Heights*, 845 F.3d 695, 699 (6th Cir. 2017).

*Issue 1: Unlawful Seizure*

The first claim for relief alleges that defendants Snyder, Stone, and Sharrock seized Stahl in violation of his constitutional rights.

While the complaint alleged that Stahl's Fourth, Fifth, Sixth, and Eighth Amendment rights were infringed by defendants in the course of their seizure of Stahl, such claims fall exclusively within the ambit of the Fourth Amendment: "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of

---

[2] Unknown to Shroyer, the MedFlight pilot had declined the request to fly due to poor weather.

a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) (quoting from *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999). Probable cause requires that a "reasonable" officer have sufficient evidence to conclude that the person seized had committed a crime. *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). In this case, the district court concluded that the deputies had probable cause to believe that Stahl had violated Ohio law, specifically Ohio Rev. Code § 2921.331(B) (willfully eluding a police officer after receiving a signal to stop a motor vehicle); Ohio Rev. Code § 2903.13(A), (C)(1) (assault); and Ohio Rev. Code § 2903.11(A)(2) (assault with a deadly weapon). *Stahl*, 2017 WL 6508384, at *7.

We agree with the assessment of the district court and affirm its judgment with respect to the lawfulness of the seizure based on its reasoning.

*Issue 2: Excessive Force Claim against Deputy Snyder*

The second claim for relief alleged that deputies Snyder, Stone, and Sharrock deprived Stahl of his Fourth Amendment right to be free from excessive force. The district court held that defendants were entitled to qualified immunity. *Stahl*, 2017 WL 6508384, at *7-11. On appeal, plaintiff has abandoned her claims against Stone and Sharrock.

This court has summarized the doctrine of qualified immunity in these terms:

> Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent

official would have concluded that the actions taken were unlawful. Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.

*Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citations and internal quotation marks omitted). "Where a suspect is attempting to flee in a vehicle, police officers are 'justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car. But, as a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.'" *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)).

Excessive force claims are analyzed under an objective reasonableness standard. *Graham*, 490 U.S. at 397. In *Graham*, the Court explained that the application of the reasonableness standard in this context "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted). In addition, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). It is an objective standard: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397 (citation omitted).

Needless to say, cases involving the use of deadly force by police are nearly always tragic and frequently present us with close questions. For instance, an unpublished case from this circuit, *Rush v. City of Lansing*, 644 F. App'x 415 (6th Cir. 2016), highlights the tension that is inherent in excessive force cases when balancing the deference that is owed to officers making split-second

9

life-or-death decisions against the right of an individual to be free from deadly force. In *Rush*, the seventeen-year-old decedent was found in a bank's storage closet, armed with scissors and a knife. *Id.* at 417. Officers took the scissors from her, but she used a steak knife to slash at one of the officers from a kneeling position. The officer shot her—once in the stomach and then, almost immediately, in the head. *Id.* We held that the second shot did not constitute excessive force: "[W]e have previously held that '[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.'" *Id.* at 422 (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005)); *see also Mullins v. Cyranek*, 805 F.3d 760, 767-69 (6th Cir. 2015) (finding no excessive force violation when an officer fired two shots in the five seconds after the suspect was no longer a threat).

In plaintiff's view, Deputy Snyder's use of force was objectively unreasonable, particularly if we view the evidence, as we must, in her favor. She relies primarily upon two pieces of that evidence—Deputy Snyder's deposition testimony and dashboard camera video from his cruiser—to support her position. She describes the video footage as showing that Deputy Snyder left a place of safety to run in front of the truck as it began to pull forward. Not only did defendant fire through the windshield as the truck approached him, he fired again through the passenger window as the truck passed him by. As plaintiff sees it, Deputy Snyder created the danger by needlessly running in front of the truck and then relied upon that poor judgment to justify his use of deadly force.

With respect to Deputy Snyder, who is the only defendant still under consideration on appeal, the district court offered the following analysis:

> In this case, . . . the danger necessitating the use of deadly force was created by Stahl himself. By the time deadly force was used against Stahl, he was no longer a non-violent fleeing suspect evading arrest for running a red light. Rather, Stahl was a violent fleeing felon who had proved he was "willing to injure an officer that

got in the way of escape [and] was willing to persist in extremely reckless behavior that threatened the lives of all those around." *See Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005).

. . . .

Specifically, shortly before Snyder opened fire, Stahl had used his vehicle as a dangerous weapon to crash into Sharrock, sending him barreling into a concrete wall. At that point, Snyder and Stone had probable cause to believe that Stahl had committed the violent felony of assaulting a police officer.

. . . .

Stahl . . . had shown he would do anything to avoid capture, including using his truck to strike the officers themselves. It was reasonable to believe that his escape would place officers and others at risk.

*Stahl*, 2017 WL 6508384, at \*9-10 (footnote and citations omitted).

This issue presents a close question, but in the end we agree with the conclusion reached by the district court. The dashboard camera video conclusively establishes that the shooting unfolded in seconds, without the benefit of calm reflection. Deputy Snyder had just witnessed Stahl's felonious assault of Deputy Sharrock. When the shots were fired, Stahl was accelerating in Deputy Snyder's direction. As already mentioned, this court does not analyze these questions through that lens. *Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). We therefore affirm the grant of qualified immunity to Deputy Snyder with respect to his use of deadly force.

*Issue 3: Deliberate Indifference to Stahl's Serious Medical Needs*

The complaint included a claim alleging that multiple defendants failed to render aid to Stahl at the scene of the shooting. On appeal, plaintiff has narrowed the number of defendants to nine: Lieutenant Dean Hettinger, Sergeant Charles George, deputies Snyder, Stone, Andrews, Brent McKee, and paramedics Travis Williams, Daniel Reedy, Jennifer Hettinger, and Jennifer Kenworthy. As framed by the complaint, all of these defendants were present at the scene of Stahl's death and, despite their constitutional obligation to do so, failed to provide necessary medical care.

11

We have explained the contours of a deliberate indifference claim in these terms:

> The Eighth Amendment does not apply to pretrial detainees. Under the Fourteenth Amendment Due Process Clause, however, pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L. Ed. 2d 605 (1983). To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [plaintiff's] health and safety. *Farmer v. Brennan*, 511 U.S. 825, 835–37, 114 S. Ct. 1970, 128 L .Ed. 2d 811 (1994). This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837, 114 S. Ct. 1970. If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments. *Id*. at 837–38, 114 S. Ct. 1970.

*Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). For purposes of our analysis, Stahl falls under the "pretrial detainee" category.

In order to hold individuals liable in their individual capacities under § 1983, a plaintiff must show that each defendant was personally involved in the alleged constitutional deprivations. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (citation omitted). "This court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citation omitted). With these precepts in mind, we turn to each defendant's role in the events that led to Stahl's death.

It is undisputed that each of these defendants was at the scene due to the fact that Stahl had been shot. That said, the plaintiff's brief fails to single out several of them by name or to discuss their individual actions, e.g., deputies Stone and Sharrock. Obviously, that is not enough to establish a disputed issue of material fact sufficient to allow the claim to proceed against those defendants. Despite these briefing deficiencies, we will focus on the actions taken by each defendant in turn

*1. Deputies Snyder and Stone*

As discussed earlier, both Deputy Stone and Deputy Snyder participated in the shooting of Stahl. Both thought he was dead and, rather than stay with him, returned to the road to check on Deputy Sharrock. With respect to Deputy Snyder, plaintiff notes that he is a licensed paramedic. Despite this training, Snyder did not leave Deputy Sharrock's side until EMS arrived.

In affirming the grant of qualified immunity to these defendants, the district court found no evidence to rebut Snyder's and Stone's contentions that they in fact believed that Stahl was dead. "If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Watkins*, 273 F.3d at 686 (citation omitted). After assessing the evidence, the district court reached two conclusions: 1) the actions taken in the wake of their subjective belief that Stahl was dead "do not constitute deliberate indifference"; and 2) they responded reasonably to the shooting by immediately summoning EMS. *Stahl*, 2017 WL 6508384, at *12.

The time line supports this conclusion. At 10:09 the Coshocton County Sheriff's dispatcher received a shots fired call. Six minutes later, Medic 3 arrived on the scene followed by Medic 11 a minute after that. Less than two minutes after arriving, Paramedic Reedy summoned Medic 11

13

to assist with a GSW (gunshot wound). Medic 11 left for the hospital with Stahl at 10:24, fifteen minutes after the "shots fired" call.

### 2. *Deputies Hettinger, George, McKee, and Andrews*

In his response to defendant's motion for summary judgment, plaintiff's counsel alleged that these defendants were "loitering on the highway" and "gawk[ing] at Stahl" while Andrews took pictures. The district court strongly disagreed with this characterization and instead found that the evidence established the following: Andrews helped Stone and Snyder attend to Sharrock until EMS arrived; he then accompanied Reedy to the truck; when they realized that Stahl was alive, Reedy went for a gurney; Andrews spent no more than a minute taking pictures while Reedy retrieved supplies; he resumed taking pictures after Stahl was moved. With respect to deputies Dean Hettinger, Charlie George, and Brent McKee, the district court summarized the allegations as nothing more than their presence at the scene and reached this conclusion:

> These facts are insufficient to hold Andrews, George, McKee, or Dean Hettinger liable for deliberate indifference. First, there is no evidence George, McKee, or Dean Hettinger ever subjectively perceived Stahl was alive and in need of assistance. Merely being present at the scene does not make them liable. Second, while the evidence shows that Andrews did perceive Stahl was alive once he opened the car door, he was entitled to rely on the medical assistance that paramedics such as Reedy were already giving Stahl.

*Stahl*, 2017 WL 6508384, at *13.

### 3. *Medics Williams, Reedy, Hettinger, and Kenworthy*

Plaintiff's argument is particularly tenuous when it comes to the claim of deliberate indifference with respect to the EMS defendants. Its only allusion to anyone other than Reedy, whose role has already been discussed, is the general statement, "The dashcam shows these EMS defendants loitering on the highway while numerous deputies gather at the truck and look in at Stahl—yet no one offers or summons medical assistance."

The facts do not support a finding of constitutional liability on the part of these individuals. Jennifer Kenworthy, who arrived in Medic 3 with Reedy, had no contact with Stahl. As she stated in her declaration, "I administered aid to Deputy Mark Sharrock. I am an EMT Basic and Dan Reedy is a Paramedic so he administered aid to Stahl who was the more seriously injured of the parties." Paramedic Travis Williams arrived with Jennifer Hettinger in Medic 2, the third EMS team on the scene. He helped to remove Stahl from the truck and pushed the gurney up the embankment. He then left, along with Reedy and EMT Jennifer LaVigne, in Medic 11, which was transporting Stahl to the hospital. They attended to Stahl on the way to the hospital by taking his pulse, putting him on a heart monitor, and establishing an IV. It was on the way to the hospital that the vital signs were taken, not in the field as plaintiff maintains. As Reedy testified, this was a "load and go" operation and no attempt at treatment was made in light of Stahl's dire medical condition.

While the shooting of Stahl is tragic, the defendant deputies called for medical attention immediately, and EMT units arrived within minutes. There is nothing in the record to support a conclusion that either law enforcement or medical personnel were deliberately indifferent to Stahl's serious medical needs. We therefore affirm the grant of qualified immunity to defendants with respect to plaintiff's claim of deliberate indifference to serious medical needs.

*Issue 4: Municipal Liability*

A municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), requires a plaintiff to first establish that a constitutional violation occurred. *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 545 (6th Cir. 2003) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use

15

of constitutionally excessive force is quite beside the point.")). Plaintiff failed to do so and, accordingly, her *Monell* claim fails.

## III.

The judgment is **affirmed**.