RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0273p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LEONA MULLINS, Individually and as the
Administratrix of the Estate of Davon L. Mullins,

*Plaintiff-Appellant,*

*v.*

No. 14-3817

OSCAR CYRANEK, City of Cincinnati Police Officer,
Individually,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cv-00384—Michael R. Barrett, District Judge.

Argued: April 22, 2015

Decided and Filed: November 9, 2015

Before: DAUGHTREY, GIBBONS, and GRIFFIN; Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Christopher D. Roach, THE DETERS FIRM, Cincinnati, Ohio, for Appellant. Peter J. Stackpole, CITY OF CINCINNATI, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Christopher D. Roach, THE DETERS FIRM, Cincinnati, Ohio, for Appellant. Peter J. Stackpole, CITY OF CINCINNATI, Cincinnati, Ohio, Donald E. Hardin, HARDIN, LEFTON, LEWIS & MARKS, LLC, Cincinnati, Ohio, for Appellee.

———————————

## OPINION

———————————

JULIA SMITH GIBBONS, Circuit Judge. Leona Mullins brought this 42 U.S.C. § 1983 action on behalf of the estate of her sixteen-year-old son, Davon Mullins, after Oscar Cyranek—

a Cincinnati police officer—fatally shot Mullins during a stop and frisk. Mullins's mother alleges Cyranek used excessive force in violation of the Fourth Amendment by firing two shots at Mullins, despite Mullins having already released his weapon. She now appeals the district court's grant of summary judgment to Cyranek based on the court's determination that he was entitled to qualified immunity. For the reasons that follow, we affirm the district court.

I.

On the afternoon of August 20, 2011, Cyranek, a police officer with the Cincinnati Police Department, was assigned to provide security outside the Black Family Reunion at Sawyer Point. During this time, Cyranek and the other officers on duty were informed that some young African American males were throwing guns over the fence to individuals who were already inside the event. After Cyranek and the other officers approached, the suspected individuals ran towards downtown Cincinnati.

Cyranek and the other officers were then told to provide extra security at Government Square and Fountain Square. While at Government Square, Cyranek saw Davon Mullins walking from Fountain Square. Although Cyranek did not recognize Mullins, he recognized the two other individuals with Mullins from Sawyer Point. Cyranek observed Mullins holding his right side, which led Cyranek to suspect that Mullins possessed a weapon. Cyranek continued to observe Mullins and followed him back toward Fountain Square. According to Cyranek, each time Mullins saw Cyranek he would position the right side of his body away from Cyranek. This movement made Cyranek even more suspicious that Mullins had a weapon. Despite his concern, Cyranek did not alert any other officers or radio in any reports of his concern.

Cyranek turned into the breezeway from Fountain Square as Mullins and his friend Recardo Sims entered the breezeway walking towards Fountain Square. Cyranek testified that he was surprised to see Mullins because, in his experience, most people carrying illegal items flee when they see a police officer. Cyranek told Mullins to stop and Mullins complied. Cyranek then approached Mullins and grabbed his wrists because he wanted to prevent Mullins from pulling out a gun, fighting him, or running away.

According to Cyranek, Mullins resisted when Cyranek grabbed his wrists. In response, Cyranek pushed Mullins into an L-shaped corner of the breezeway to ensure the safety of the people in Fountain Square. Recardo Sims, the only witness present, testified in his affidavit that it was Cyranek who started "tussling" with Mullins. Sims Aff. 1:7, ECF No. 34-2. As evidenced in the security footage, while still holding onto Mullins, Cyranek pushed Mullins to the ground and ended up behind Mullins's back. Cyranek testified that he was able to keep Mullins down on the ground because he was bigger than Mullins. And according to Sims, Mullins was struggling to protect himself as he was much smaller than Cyranek. During this time, Cyranek checked one side of Mullins's cargo pants as Mullins said something along the lines of "I didn't do anything." Cyranek Dep. 161–62, ECF No. 27. The entire confrontation lasted nearly two minutes.

While Cyranek held Mullins to the ground, Mullins yelled something to Sims and Sims approached. According to Sims, he asked Cyranek what was going on and what Mullins did wrong, but Cyranek did not recall Sims saying anything to him. Cyranek claims that when he told Sims to step away, he saw that Mullins had a weapon in his right hand with the finger on the trigger. According to Sims, Cyranek told Mullins to drop the gun and, in response, Mullins threw it over Cyranek's left shoulder.[1]

Cyranek testified that for nearly the entire encounter with Mullins he had his right hand on Mullins's right bicep and was able to control his arms. Sims also testified that Cyranek "was always in control of Davon." Sims Aff. 2:11, ECF No. 34-2. But at some point after Mullins brandished the gun, he gained enough freedom from Cyranek's grip to throw his weapon ten to fifteen feet behind Cyranek. At the same time Mullins threw his gun, Sims turned and sprinted away from where Cyranek and Mullins were engaged. Likewise, other surveillance footage shows patrons at a crowded patio bar nearby visibly reacting to the events at this time.

As Mullins threw his gun, Cyranek quickly rose from his crouched position and fired twice. The footage shows that, at most, five seconds elapsed between when Mullins threw his firearm and when Cyranek fired his final shot. J. Scott Spicer, an Ohio police officer trained in

---

[1] Although Cyranek stated in both his deposition and in the investigation interview that Mullins threw the gun *after* Cyranek fired two shots, the video footage of the incident indicates otherwise. On appeal, Cyranek accepts Mullins's version of the facts.

the same procedures as Cyranek, testified that an officer is trained to fire twice only in a "'body armor take-down' situation," otherwise an officer may fire to stop the aggressive action but then must reassess the threat, re-evaluate, and fire again if necessary. Spicer Aff. 6:39, ECF No. 34-1.

Surveillance video of the incident does not show precisely when, within the five second window, Cyranek fired his two shots. The only evidence of the timing of the shots are the bullet casings, which can be seen flying across the screen in one of the surveillance videos. The first casing appears approximately three seconds after Mullins threw his gun. The second casing appears approximately two seconds after the first. However, it bears noting that the bullet casings are not conclusive evidence of the precise timing of Cyranek's shots. The footage shows Cyranek first turn away from Mullins in the direction of where Mullins's gun landed while the second bullet casing flies into view. If we were to assume that the bullet casings appear instantaneously with the actual shots, then we would also have to assume that Cyranek fired his second shot while he was turned away from Mullins, but there is nothing in the record to support such an assumption.

After firing the two shots, Cyranek retrieved the gun that Mullins had thrown and placed it near Mullins's feet. Cyranek claims to have done so to secure the weapon so that no one else could pick it up. He acknowledged that in doing so he changed the scene of the shooting. As other officers arrived on the scene, Cyranek handcuffed Mullins.

Medics transported Mullins to a hospital where he was pronounced dead. An autopsy found the cause of death to be a gunshot wound to the torso. The post-mortem examination revealed that Mullins was shot in the back of his left shoulder and that the bullet traveled a downward path from left to right.

On May 16, 2012, alleging violations of rights guaranteed under the United States Constitution, Leona Mullins filed suit on behalf of her son's estate under § 1983.**²** She also asserted four state causes of action: wrongful death, negligence, assault, and battery. Cyranek moved for summary judgment, asserting qualified immunity. The district court determined that

---

**²**Leona Mullins's complaint additionally asserted a denial of Davon Mullins's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments and the Ohio Constitution, as well as a denial of due process in violation of the Fourteenth Amendment and the Ohio Constitution. These claims were dismissed unopposed.

Cyranek was entitled to qualified immunity because he acted reasonably under the circumstances. *Mullins v. Cyranek*, No. 1:12CV384, 2014 WL 3573565, at *11–12 (S.D. Ohio July 21, 2014).

II.

A district court's grant of summary judgment is reviewed *de novo. Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The court must assume the truth of the non-moving party's evidence, drawing all inferences in a light most favorable to that party. *Ciminillo*, 434 F.3d at 464. If, in doing so, there is sufficient evidence for a trier of fact to find for the non-moving party, a genuine dispute of material fact exists. *Id.*

III.

Police officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012). Qualified immunity provides police officers "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (citations and quotation marks omitted). In a civil suit arising from the use of deadly force, immunity should be recognized "if officers of reasonable competence could disagree on the issue." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

To determine whether an officer is entitled to qualified immunity, we apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such "that a reasonable official would understand that what he is doing violates that right." *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (citation omitted). The order in which we analyze these two prongs is left to our "sound discretion." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because it is axiomatic that

individuals have a clearly established right not to be shot absent "probable cause to believe that [they] pose[] a threat of serious physical harm, either to the officer or to others," *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)), we must determine whether, in light of the facts and circumstances of this case, Cyranek's use of deadly force violated Mullins's Fourth Amendment right to be free from excessive force.

In answering whether Cyranek violated Mullins's constitutional rights, we must determine whether his use of deadly force was reasonable under the Fourth Amendment. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). In prior cases we have employed a non-exhaustive list of three factors to evaluate whether an officer's actions are reasonable: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights,* 437 F.3d 527, 534 (6th Cir. 2006). These factors help inform our ultimate inquiry, which must always be "whether the totality of the circumstances" justified the use of force. *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007). We must judge the reasonableness of the use of force from the perspective of a reasonable officer on the scene and not through the lens of 20/20 hindsight, allowing for the fact "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Saucier*, 533 U.S. at 206 (noting that qualified immunity serves to "protect officers from the sometimes hazy border between excessive and acceptable force") (citation and quotation marks omitted). In making this judgment, we must be careful not to substitute "our personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). Rather, we must adopt a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). After all, "[w]hat constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (citation omitted).

Turning to the reasonableness factors, we find that the severity-of-the-crime inquiry weighs in favor of Cyranek. We measure the reasonableness of the use of deadly force at a particular time based on an "objective assessment of the danger a suspect poses *at that moment.*" *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (emphasis added). Thus, in analyzing the reasonableness of Cyranek's use of force, we must look at Mullins's behavior immediately prior to the moment he was shot. Although Cyranek admits that, at the outset, he had probable cause to believe only that Mullins had a weapon—a first degree misdemeanor if possessed without a permit, *see* Ohio Rev. Code § 2923.12—Mullins removal of a handgun in Cyranek's presence without Cyranek's permission constituted a much more serious offense. *See, e.g.,* Ohio Rev. Code § 2923.12(B)(3), (F)(5) (making it a fifth degree felony for someone with a concealed handgun license to remove their firearm without permission during a law enforcement stop). The district court noted that Mullins' actions may also fall within Ohio's felonious assault statute. *Mullins*, 2014 WL 3573565, at *11 n. 17 (citing Ohio. Rev. Code § 2903.11). The resistance factor also weighs in favor of Cyranek. Prior to the fatal shooting, Mullins physically struggled with Cyranek for well over a minute, and Mullins decision to produce his firearm without permission also weighs against him.

The question of whether it was reasonable for Cyranek to believe that Mullins posed a significant threat at the time Mullins was shot is the crux of this appeal. In excessive force cases, the threat factor is "a *minimum* requirement for the use of deadly force," meaning deadly force "may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) (emphasis added); *see also Ciminillo*, 434 F.3d at 468 (stating that a person has a "right not to be shot unless they are perceived as posing a threat to officers or others") On appeal, Cyranek concedes that he shot Mullins only after Mullins threw his gun, but he maintains that the confrontation unfolded in such rapid succession that he did not have a chance to realize that a potentially dangerous situation had evolved into a safe one. *See Smith v. Cupp*, 430 F.3d 766, 774–75 (6th Cir. 2005).

The fact that a situation unfolds quickly "does not, by itself, permit [officers] to use deadly force." *Id.* at 775. Rather, qualified immunity is available only where officers make

split-second decisions in the face of serious physical threats to themselves and others. *See Godawa v. Byrd*, 798 F.3d 457, 465 (6th Cir. 2015); *Smith*, 430 F.3d 775; *Sample*, 409 F.3d at 696–97. We have previously held that "[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan v. City of Lorain*, 430 F.3d 312, 315–16 (6th Cir. 2005). Here, it is undisputed that within a five-second span, Mullins removed a previously concealed firearm without any direction from Cyranek to do so, threw the weapon over Cyranek's shoulder after being commanded to drop it, and was then shot at twice and struck once by Cyranek. Importantly, all of these events transpired in the early evening hours in a breezeway leading onto Fountain Square, a populated city square with shops, restaurants, hotels, and offices in downtown Cincinnati.

This is not a case where "a jury could conclude that [Cyranek] was not in any danger in the first place." *Smith*, 430 F.3d at 775; *see also Kirby v. Duva*, 530 F.3d 475, 481–82 (6th Cir. 2008) (denying qualified immunity to officer where, under plaintiffs facts, "no one was ever in danger"). Mullins had his finger on the trigger of a gun, and at that time, he posed a serious threat to Cyranek and the general public at Fountain Square, including Sims, Mullins's friend, who can be seen in video footage sprinting away from Cyranek and Mullins at the same time Mullins pulls out and throws his gun. While Cyranek's decision to shoot Mullins after he threw his weapon may appear unreasonable in the "sanitized world of our imagination," *Dickerson*, 101 F.3d at 1163 (citation omitted), Cyranek was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable. *See Untalan* 430 F.3d at 315–16 (finding police officer's use of deadly force reasonable where only a "few seconds" passed between when assailant lost control of knife and when officer shot assailant); *see also Troupe v. Sarasota County,* 419 F.3d 1160, 1168 (11th Cir. 2005) (finding that 3–5 seconds was a short enough time for the use of deadly force to stop someone who previously endangered police and bystanders even if, in hindsight, the facts show that members of the S.W.A.T. Team could have escaped unharmed); *Robinson v. Arrugueta,* 415 F.3d 1252, 1256 (11th Cir. 2005) (holding that an Officer's decision to shoot within a reaction time of 2.72 seconds was reasonable, even if hindsight showed that the officer could have escaped unharmed); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (justifying

use of deadly force in the "very few seconds" after a serious threat had subsided); *McLenagan v. Karnes,* 27 F.3d 1002, 1007–08 (4th Cir. 1994) (justifying the use of deadly force against an unarmed, handcuffed suspect when an officer reasonably believed that a fellow officer had seen a gun in the suspect's hands, in large part because the officer "had no time to consider anything at all").

The fact that Mullins was actually unarmed when he was shot is irrelevant to the reasonableness inquiry in this case. *See Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403–04 (6th Cir. 2015), *cert. denied* (2015 WL 4467981) ("That [decedent] was actually unarmed and did not have a permit is beside the point"). Rather, "what matters is the reasonableness of the officers' belief . . . ." *Id.* Because only a few seconds passed between when Mullins brandished his firearm and when Cyranek shot Mullins, a reasonable officer in the same situation could have fired with the belief that Mullins still had the gun in his hand. *See Untalan* 430 F.3d at 315. While hindsight reveals that Mullins was no longer a threat when he was shot, we do not think it is prudent to deny police officers qualified immunity in situations where they are faced with a threat of severe physical injury or death and must make split-second decisions, albeit ultimately mistaken decisions, about the amount of force necessary to subdue such a threat. *See, e.g.*, *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 792 (4th Cir. 1998) ("[W]e do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him."); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) ("Also irrelevant is the fact that [the decedent] was actually unarmed . . . The sad truth is that [the decedent's] actions alone could cause a reasonable officer to fear imminent and serious physical harm.")

Our reasoning applies equally to both of the shots fired by Cyranek. We have previously held that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Dickerson*, 101 F.3d at 1162 n.9 (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)). Here, however, Cyranek's second shot did not come at a time after which a reasonable officer would think the threat had passed. Rather, Cyranek's second shot came within the time frame in which a reasonable officer could have acted under the perception that Mullins was still armed. *See Untalan*, 430 F.3d at 315.

Indeed, the video footage shows that Mullins's gun landed some ten to fifteen feet behind Cyranek out of his line of sight and that Cyranek did not turn towards where it landed until after he fired his second shot.

In *Boyd v. Baeppler*, we found that an officer was entitled to qualified immunity where he shot the decedent seven times even after the decedent had been brought down by another officer's shot. 215 F.3d 594, 602–04 (6th Cir. 2000); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 910–16 (6th Cir. 2009) (finding officers were entitled to qualified immunity where they shot a knife-wielding suspect ten times); *Livermore*, 476 F.3d at 401–05 (finding it objectively reasonable for officer to fire two shots at suspect who posed a serious threat to other officers). We noted that the question of reasonableness was clear because the officer was acting in self-defense against a felon "reasonably thought to be armed and dangerous." *Boyd*, 215 F.3d at 602–03. *Boyd* and *Untalan* thus combine to answer any question about the reasonableness of Cyranek's second shot. Because we find that a reasonable officer could have believed that Mullins was armed for the "few seconds" after Cyranek saw the gun in Mullins hand, it was reasonable for Cyranek to fire a second time within that time frame. Cyranek's second shot was not unnecessary, gratuitous, or otherwise excessive, particularly in light of the fact that the autopsy report showed Mullins only suffered one gunshot wound.

J. Scott Spicer, a former Ohio police officer, testified that Cincinnati police officers are trained to fire two shots only in a "'body armor take-down situation," but that, otherwise, officers should fire a second shot only if they deem it necessary after reassessing and re-evaluating the threat. Spicer Aff. 6:39, ECF no. 34-1. Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases, but it is not necessarily conclusive proof that the Constitution has been violated. Rather, the key inquiry is whether a reasonable officer in the same circumstances would have used the same amount of force. Here, we find that at the time he fired both shots, it was reasonable for Cyranek to perceive Mullins as a serious threat to himself and others. That conclusion, coupled with the other reasonableness factors compels us to conclude that Cyranek's use of deadly force was reasonable under the circumstances.

Our opinion should not be taken to condone the whole of Cyranek's behavior. Indeed, we find some of Cyranek's conduct problematic, particularly his failure to alert any other officers before physically confronting Mullins, and his decision, following the shooting, to alter the scene by moving Mullins's gun closer to his body. However, these misjudgments are not relevant to his qualified immunity defense. As noted above, we must analyze the reasonableness of an officer's use of deadly force based on an "objective assessment of the danger a suspect poses *at that moment*." *Bouggess*, 482 F.3d at 889 (emphasis added). We cannot say that during the critical moments just after Mullins drew his gun Cyranek's actions were unreasonable. At a minimum, we believe that reasonable officers could disagree about what force was necessary in this situation. And, thus, we find that no constitutional violation occurred and that Cyranek is entitled to qualified immunity.

IV.

Leona Mullins also alleges state law claims of wrongful death, negligence, assault, and battery. Relying on its finding that Cyranek's actions were objectively reasonable in the context of Mullins's § 1983 claim, the district court dismissed Leona Mullins's state-law claims. We agree with the district court and conclude that Cyranek is entitled to immunity on Leona Mullins's state-law claims as well. Because we find that Cyranek's use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with "malicious purpose, in bad faith, or in a wanton or reckless manner," as required to avoid statutory immunity under Ohio law. Ohio Rev. Code § 2744.03 (A)(6)(b); *see Chappell*, 585 F.3d at 916 n.3 (finding that where officer who acted reasonably was entitled to qualified immunity on both federal and Ohio state-law claims).

V.

The shooting of Davon Mullins was an unfortunate tragedy. Yet, as we view the undisputed facts of this case in light of binding precedent, we are compelled to conclude that Cyranek's split-second decision to use deadly force was not objectively unreasonable. Although Cyranek was ultimately mistaken about the continuing nature of the risk involved, his mistake was a reasonable one under the circumstances, and 42 U.S.C. § 1983 does not purport to redress

injuries resulting from reasonable mistakes.  For the foregoing reasons, we affirm the district court's order granting summary judgment to Cyranek.