**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0122n.06**
**No. 18-1282**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PATRICIA NELSON, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| CITY OF BATTLE CREEK, MICHIGAN, | ) | UNITED STATES DISTRICT |
| Defendant, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| ESTEBAN RIVERA, | ) | |
| Defendant-Appellant. | ) | |

**FILED**
Feb 26, 2020
DEBORAH S. HUNT, Clerk

**BEFORE: MOORE, GIBBONS, and COOK, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** In November 2013, City of Battle Creek police officer Esteban Rivera responded to reports of an armed man outside the Drive-Thru Party Store. In the parking lot, Rivera encountered a teenage boy, N.K., who fit the report's description. Rivera got out of his patrol car and shouted, "let me see your hands." Rivera drew his firearm. In a span of two seconds, three undisputed things happened: (1) N.K. pulled a black BB handgun—altered to resemble a real handgun—out of his waistband; (2) N.K. tossed it aside and raised his hands; and (3) Rivera shot N.K. in the shoulder.

N.K., by and through his mother Patricia Nelson, sued Rivera under § 1983, claiming that Rivera violated his Fourth Amendment rights by using excessive force. In defense, Rivera raised qualified immunity. The district court denied qualified immunity, finding that factual disputes

precluded summary judgment.  Conceding the facts in a light most favorable to N.K., Rivera appealed.  We reverse.

I.

On November 16, 2013, N.K. and his friends were playing "cops and robbers" around his neighborhood.  N.K. carried around his Airsoft BB gun to make their game feel "more real."  DE 60-3, N.K. Dep., Page ID 226.  This toy handgun was all black and missing its blaze-orange barrel tip which typically characterizes these types of toy guns.  N.K. and his friends took a break from their cops-and-robbers game in the parking lot of the Drive-Thru Party Store.  In front of the party store, N.K. crouched down behind a sign, with the BB gun tucked into his waistband.

Meanwhile, a Battle Creek dispatcher reported that a white male was carrying a black handgun near the party store.  At 11:58 a.m., Rivera responded to the dispatch call and drove to the party store.  As Rivera approached in his patrol car, N.K. emerged from behind the sign and walked toward his friends by the storefront.  Rivera stopped in front of N.K. and his friends, immediately exited his patrol car, and shouted "let me see your hands, let me see your hands."  DE 60-10, Dash Cam, at 02:13–02:15.

Several things happened within the next two seconds.  N.K. pulled the gun out of his waistband and tossed it away before raising his hands.  While N.K. was doing this, Rivera fired his weapon at N.K.  The dash cam video does not depict Rivera in-frame, nor does it completely show N.K.  It does, however, capture the audio and timing of this exchange.  While Rivera utters his second "let me see your hands" order, one of N.K.'s friends moves away from the patrol car.  N.K. becomes partially visible.  N.K.'s right hand appears near his right shoulder.  Rivera fires his weapon.  N.K. then turns slightly and crouches down, and his left hand appears near his left ear.

While both parties agree that is what occurred within that two-second time span, they disagree about the exact sequence of each independent act. N.K.'s view of the facts is that he dropped the gun before Rivera shot him. In Rivera's view, he "made the decision" to shoot while N.K. was still gripping and raising the gun. DE 60-1, Rivera Dep., Page ID 220. According to Rivera, it was only after he decided to shoot and started pulling the trigger that he realized N.K. was tossing the gun away. Importantly, for purposes of this appeal, Rivera has conceded that "at the moment the bullet *actually* hit N.K., N.K. had thrown away the gun and had begun to raise his hands 'sort of halfway or whatever.'" CA6 R. 27, Appellant Reply Br., at 7.

Rivera's single shot struck N.K. in his shoulder. N.K. then ran away as Rivera shouted "Get on the ground. Get on the ground." DE 60-10, Dash Cam, at 02:16–02:18. Rivera stayed in the parking lot and reported the incident over his radio. Officers found N.K. nearby and took him to the hospital for treatment.

In May 2016, Nelson sued Rivera and the City of Battle Creek for damages under 42 U.S.C. § 1983. Nelson alleged that Rivera violated N.K.'s Fourth Amendment right to be free from excessive force. Nelson later dismissed the claims against the City. Rivera raised a qualified immunity defense and moved for summary judgment. Finding that the "facts in this case rest somewhere between [Rivera]'s version and [N.K.]'s version," DE 76, Op., Page ID 630, the district court denied Rivera's motion. The district court specifically noted three major factual disputes that precluded summary judgment: (1) whether N.K. was "brandishing a gun" or "unarmed"; (2) whether N.K. complied with Rivera's orders; and (3) the timing of the shooting relative to N.K.'s compliance and handling of the gun. DE 76, Op., Page ID 630–33. Rivera appealed.

II.

We review *de novo* a district court's denial of a summary judgment motion based on qualified immunity. *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)). We must "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Indeed, for purposes of appeal, "a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002) (citing *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999)).[1] At the same time, however, we must consider "only the facts that were knowable to the defendant officer[]" when a case concerns the defense of qualified immunity. *White v. Pauly*, 137 S. Ct. 548, 550 (2017).

When there is a video record of the incident, we take the facts as they appear in the video, which may not necessarily be in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378–80; *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Any remaining gaps or ambiguities in the facts as recorded in the video, however, are to be viewed in the light most favorable to the nonmoving party." *Latits*, 878 F.3d at 544.

III.

"Police officers are immune from civil liability, unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights."

---

[1] While the parties debated below the exact factual circumstances of those two seconds surrounding Rivera's shooting N.K., Rivera has conceded the facts in N.K.'s favor—those not contradicted by the dash cam video—for purposes of this appeal.

*Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). Qualified immunity allows police officers "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (citations and internal quotation marks omitted). Our court has long recognized that the purpose of this doctrine is to protect officers "from undue interference with their duties and from potentially disabling threats of liability." *Bailey*, 409 F.3d at 695 (quoting *Elder v. Holloway*, 510 U.S. 510, 514 (1994)). Once the defending officer raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *Coble v. City of White House*, 634 F.3d 865, 870–71 (6th Cir. 2011).

There need not be "a case directly on point" for the law to be clearly established, "but existing precedent must have placed the statutory or constitutional question *beyond debate*." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). To violate a plaintiff's clearly established right, an officer's conduct must be such that, at the time of the allegedly-violative conduct, the contours of that right were sufficiently defined that every "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Whether an asserted constitutional right was "clearly established" at such time "presents a question of law," not fact. *Elder*, 510 U.S. at 516 (quoting *Mitchell*, 472 U.S. at 528).

We follow a two-prong analysis to determine whether qualified immunity applies in a given case: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the challenged conduct. *Burgess*, 735 F.3d at 472 (citing *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012)). *See also Saucier v. Katz*, 533 U.S. 194, 201

(2001). The order in which we address these questions is a matter of discretion. *Pearson v. Callahan*, 555 U.S. 223, 226 (2009).

In cases involving the use of excessive force, the qualified immunity question "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). This court has said that an officer's seizure by use of deadly force is permissible "only in rare instances." *Bailey*, 409 F.3d at 697. Qualified immunity should nonetheless apply "if officers of reasonable competence could disagree on the issue." *Mullins*, 805 F.3d at 765 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The district court denied Rivera's motion for summary judgment because it found the legal question—whether Rivera violated N.K.'s clearly established constitutional rights—turns on disputed facts and depends on which view of the facts the jury might accept. The material facts, however, can be gleaned from the parties' joint statement and the dash cam video. N.K.'s own deposition testimony fills any gaps, and Rivera has conceded to N.K.'s version of the facts to the extent they do not contradict those captured by video. The "key disputed issues," according to the district court, are "N.K.'s compliance vis-á-vis the timing of the shooting" and what movement N.K. made with his hands when Rivera ordered him to show his hands. DE 76, Op., Page ID 634. But these are not genuinely disputed. N.K. acknowledged that, when given an order to raise his hands, he pulled the BB gun out of his pants and then raised his hands. Rivera, in turn, has conceded that, by the time he shot N.K., N.K. had released the gun and begun raising his hands.

As explained below, the law was not so clearly established that every reasonable officer would know that shooting N.K. under these specific circumstances would constitute an excessive and unconstitutional use of force. Qualified immunity, therefore, applies.

To determine whether a constitutional right is clearly established, we "first look to decisions of the Supreme Court, then decisions of the Sixth Circuit . . . , and finally to decisions in other circuits." *Landis v. Baker*, 297 F. App'x 453, 462 (6th Cir. 2008) (citing *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997)).

We have previously held that a suspect "ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight," and that such rule "has been clearly established in this circuit" for decades. *Bailey*, 409 F.3d at 699 (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)). *See also Mullins*, 805 F.3d at 765 (noting that it is "axiomatic" that suspects have a clearly established right not to be shot absent a reasonable belief that they pose a threat of serious physical harm). In *Bailey*, we explained the "*Robinson* principle" as follows:

> [R]egardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others.

*Bailey*, 409 F.3d at 699.

Our *Robinson* rule is effectively a restatement of the rules from *Graham* and *Garner*. *See Graham*, 490 U.S. at 388 (establishing the general proposition that use of force contravenes the Fourth Amendment if it is excessive under objective standards of reasonableness); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding that deadly force is only constitutionally permissible if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others").

But clearly established law must be defined with more specificity. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the

specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)); *see also White*, 137 S. Ct. at 552 ("The [lower court] misunderstood the 'clearly established' analysis: it failed to identify a case where an officer acting under similar circumstances as [the officer] was held to have violated the Fourth Amendment."). Therefore, outside of "an obvious case," the general principles of *Graham* and *Garner*—and thus the Sixth Circuit's *Robinson* rule—cannot clearly establish the law applicable to various sets of facts, including the facts in this case. *See Brosseau*, 543 U.S. at 199; *see also Mullenix*, 136 S. Ct. at 308–09 (noting that defining clearly established law in the Fourth Amendment context requires a high "degree of specificity"); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (instructing courts not to define clearly established law at a "high level of generality" because doing so ignores the crucial inquiry of whether the officer acted reasonably under the circumstances faced); *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (noting that *Garner* and *Graham* are cast at a "high level of generality" and will not suffice outside of an "obvious case").

We must therefore inquire whether, as of November 16, 2013, it was clearly established that it was unconstitutional for an officer to shoot when, over the span of two seconds, someone pulls what appears to be a gun, drops it, and raises his hands after being given a warning. We hold it was not. Rivera reasonably perceived a threat of serious physical harm when he saw N.K. reach for and grab what looked like a real gun. It was not objectively unreasonable for Rivera to decide to shoot N.K. as he saw N.K. grip and raise his gun, even if the bullet ultimately struck N.K. after he had dropped the gun.

Neither the district court nor Nelson identified any case law where an officer under sufficiently similar circumstances was held to have violated the Fourth Amendment. The district court instead relied on what it perceived as "sufficient factual disputes" as to the reasonableness

of Rivera's conduct. DE 76, Op., Page ID 634. The dissent similarly says the evidence is "equivocal" as to whether Rivera shot N.K. while N.K threw away his gun or after doing so. Dissent at 2. To the extent any facts are disputed, however, these disputes do not deprive Rivera of qualified immunity. The dissent highlights testimony from N.K. and his friend suggesting that Rivera shot N.K. after he had already thrown away his gun. But these observations about when N.K. was struck—which Rivera concedes was after N.K. threw his gun away—do not create a dispute of fact as to when Rivera *decided* to shoot. Rivera claims he decided to shoot when he saw N.K. grab and raise the gun. Nelson fails to dispute this fact because N.K. and other witnesses cannot speak to Rivera's decision-making or his perception of harm in the two-second span the events unfolded

Even assuming that N.K. dropped the gun—and was raising his hands—before Rivera shot him, this does not alter our analysis. "What matters is the reasonableness of the officers' belief," and "[t]he fact that [N.K.] was actually unarmed when he was shot is irrelevant to the reasonableness inquiry in this case." *Mullins*, 805 F.3d at 767. Although "hindsight reveals that [N.K.] was no longer a threat when he was shot, we do not think it is prudent to deny police officers qualified immunity in situations where they are faced with a threat of severe physical injury or death and must make split-second decisions." *Id.* at 768. Indeed, the Supreme Court and Sixth Circuit have repeatedly said that an officer's employment of deadly force in split-second decisions when faced with a threat of serious injury or death should not be questioned. *See Kisela*, 138 S. Ct. at 1153 (holding that an officer's use of deadly force did not violate clearly established law when the suspect was wielding a kitchen knife and the officer "had mere seconds to assess the potential danger"); *Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) ("This objective reasonableness analysis 'contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances . . . .'"); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.").

Nelson argues that "at the time of the subject shooting it was clearly established that [N.K.] had the right to be free from deadly force." CA6 R. 26, Appellee Br., at 23 (citing *Bailey*, 409 F.3d at 697). As explained above, however, this generalized restatement of the principles of *Graham* and *Garner* does not suffice to "define clearly established law." *See, e.g.*, *Wesby*, 138 S. Ct. at 590; *White*, 137 S. Ct. at 552; *Plumhoff*, 572 U.S. at 779; *Brosseau*, 543 U.S. at 198–99. And Nelson's reliance on *Bailey* as factually analogous is misplaced. The case in *Bailey* arose from an officer's decision to shoot an unarmed suspect hiding inside a cabinet in a building that he had attempted to burglarize. 409 F.3d at 691–92. Law enforcement had ordered the suspect to come out of the cabinet with his hands visible. *Id.* at 693–94. The suspect used one of his hands to pull himself out of the cabinet, and an officer shot him. *Id.* at 692–95. First, this court held that the officer's conduct violated the suspect's rights because the officer lacked probable cause to believe that the suspect's movement posed a threat to the officers' safety. *Id.* at 697–98. Second, the panel held that the rights violated were "clearly established," reasoning that our previous precedents provided the officer with adequate notice that shooting a criminal suspect is unreasonable "unless the suspect poses a perceived threat of serious physical harm to the officer." *Id.* at 699. The facts

in the instant case are distinguishable. Unlike the suspect in *Bailey* who was attempting to comply with the officer's command to come out of the cabinet, N.K. initially pulled the gun from his waistband after Rivera's command to show his hands. An officer in Rivera's shoes could reasonably have perceived N.K. as a threat to his safety and/or to the safety of the other children in the party store parking lot. Accordingly, *Bailey*'s rule against the application of force when a suspect does not pose a threat to an officer's safety was insufficient to put Rivera on notice of the constitutionality of his actions when N.K. did pose a threat.

N.K.'s reliance on *Sova* is similarly unpersuasive. In *Sova*, two police officers shot a man while standing in the doorway of his parents' kitchen and holding two butcher knives. 142 F.3d at 900–01. The man's father had called 911 after seeing blood on his kitchen floor and receiving a call from a friend concerned about the man's mental state. *Id.* at 900. When police arrived, they found the man holding two knives, breaking kitchen windows, and cutting himself. *Id.* at 900–01. At one point, the officers shot and killed the man. *Id.* at 901. The district court in *Sova* granted qualified immunity to the officers, finding as a matter of law that the officers acted reasonably. *Id.* On appeal, this court reversed because the record "demonstrate[d] clearly that the two sides [did] not agree on the facts" and the district court "overlooked contentious factual disputes concerning the officers' actions." *Id.* at 902–03. The panel did not resolve the qualified immunity question because the parties had "irreconcilable versions of what happened the night [the man] was killed." at 900. Relying on *Sova*, Nelson contends that we must affirm the district court because Rivera's "request for qualified immunity [is] based upon the hotly contested disputed facts in this case." CA6 R. 26, Appellee Br., at 24. According to Nelson, the parties dispute the timing of the shooting vis-à-vis N.K.'s handling of the gun. But as explained above, the materials facts can be gleaned from the parties' joint statement and the dash cam video, and these are not in dispute.

Finally, the dissent relies heavily on this court's holding in *Bletz v. Gribble* that armed individuals have a clearly established right "to be free from deadly police force while complying with police commands to disarm." 641 F.3d 743, 754 (6th Cir. 2011). In *Bletz*, we denied qualified immunity to a police officer who shot an armed man because we found a factual dispute existed as to whether the man began lowering his gun—in compliance the officer's commands—before the officer shot him. *Id.* at 752. But the dissent fails to account for a key difference between the circumstances in *Bletz* and those here: While police in *Bletz* commanded the armed man to lower his gun and the man allegedly began to do so, Rivera commanded N.K. to show his hands and N.K. undisputedly first reached for the gun in his waistband. Only after grabbing and throwing the gun did N.K. begin to comply with Rivera's command to raise his hands. *Bletz* therefore hardly supports the dissent's view.

Thus, Nelson has not met her burden to demonstrate that the contours of N.K.'s right were sufficiently defined such that "every reasonable official" in Rivera's shoes would understand that using deadly force would violate N.K.'s constitutional rights. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted); *see also Anderson*, 482 U.S. at 640. This court's previous holdings tend to indicate the opposite. *See, e.g.*, *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000) (reversing the denial of qualified immunity for police officers who used deadly force after an individual pulled a gun after they commanded him to stop); *Bell v. City of East Cleveland*, 125 F.3d 855 (Table), No. 96-3801, 1997 WL 640116 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for police officer who used deadly force after a minor pulled a toy gun following the officer's command to stop).

The case before us is not an "obvious case" such that, under the general principles of *Garner*, *Graham*, and *Robinson*, a reasonable officer would be aware that shooting N.K. violated

his clearly established constitutional rights. *See Bailey*, 409 F.3d at 699 (holding that it was an "obvious case" that a police officer may not shoot an unarmed, intoxicated, and unresponsive suspect who moved his hand when ordered to exit the cabinet where he was hiding). General prohibitions do not suffice as clearly established law in this case. Nor has Nelson identified a sufficiently analogous case in which an officer was held to have violated the Fourth Amendment. We find, then, that N.K.'s right to be free from excessive force under these circumstances was not clearly established. Therefore, we reverse the district court's denial of qualified immunity and remand for the entry of summary judgment on the basis of qualified immunity.

**KAREN NELSON MOORE, Circuit Judge, dissenting**. It should go without saying that reasonable police officers do not shoot disarmed young boys with upraised hands. But because the majority misconstrues both the factual record and our circuit precedent to condone that result here, I must respectfully dissent. I would affirm the district court and allow this case to proceed to trial.

As the majority recognizes, "when undertaking the qualified immunity analysis on summary judgment" "we must consider the facts in the light most favorable to [the plaintiff] and make all reasonable inferences in [his] favor." *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015); *accord Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). Indeed, even to bring an interlocutory appeal like this one, the officer-defendant "must be willing to concede the most favorable view of the facts to the plaintiff." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (citations omitted). Relatedly, although we must accept facts shown on video as true when "a reasonable jury could view those facts only one way," "[t]o the extent that facts shown [on] video[] can be interpreted in multiple ways," or are otherwise unclear, that video, too, must "be viewed in the light most favorable to [the plaintiff]." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

Yet, contrary to this law, the majority repeatedly accepts Rivera's framing of the evidence over N.K.'s. More specifically, in its recitation of the facts, the majority states that "*[w]hile* N.K. was [pulling the gun out of his waistband and tossing it away], Rivera fired his weapon at N.K." Maj. Op. at 2 (emphasis added). Then, in its discussion of the law, the majority builds upon this assertion, insisting that, although there may be a triable dispute as to whether N.K. had a gun in his hand at the moment Rivera's bullet "struck" him, that dispute does not matter because there is (supposedly) no dispute that N.K. was still armed "when Rivera *decided* to shoot." *Id*. at 9.

This kind of metaphysical line drawing is confusing, for one; I struggle to see the distinction between Rivera "deciding" to shoot N.K. and Rivera actually "shooting" N.K. But more importantly, this framing fails to view the record in the light most favorable to N.K., as we must at this stage. Fairly read, the parties' deposition testimony is equivocal as to whether Rivera shot N.K. *while* N.K. was throwing down his gun and raising his hands or *after* N.K. had taken those two actions. *Compare, e.g.*, R.60-1 (Rivera Dep. at 79) (Page ID #205) ("[T]he decision to shoot was made when [N.K.] was pulling the weapon on me.") *with* R.60-3 (N.K. Dep. at 231–32) (Page ID #234-35) ("I go to put my hands up [after I dropped my gun and kicked it away] *and then* he shoots.") (emphasis added) *and* R.60-6 (S.C.[1] Dep. at 73) (Page ID #250) ("All I remember is seeing the cop saying put his hands up and I see in the corner of my eye [N.K.] puts his hands up halfway *and then* the cop shot him.") (emphasis added). And although we would be dutybound to reject N.K.'s and S.C.'s testimony if clear video evidence contradicted it, the dash-cam evidence submitted by Rivera is inconclusive. *Accord* Maj. Op. at 2 ("The dash cam video does not depict Rivera in-frame, nor does it completely show N.K."). Indeed, if anything, the dash-cam video supports N.K. For example, at the 2:15 mark in the video—an instant before Rivera shoots N.K. and an instant after Rivera orders N.K. to show him his hands—N.K.'s right hand is visibly raised, and empty. R.60-10 (Dash Cam). This seemingly minor detail matters because both N.K. and Rivera testified that, when N.K. discarded his firearm, he used his right hand. *See* R.60-3 (N.K. Dep. at 231) (Page ID #235); R. 60-1 (Rivera Dep. at 80) (Page ID #205).

All told, although a reasonable jury *could* accept Rivera's narrative (that he shot N.K. while N.K. was pulling a realistic-looking toy gun out of his pants), it could *alternatively* accept N.K.'s narrative (that Rivera shot him *after* he had thrown his gun to the ground and begun raising his

---

[1] S.C. was one of the young adolescent girls accompanying N.K. at the party store.

hands). And so, for purposes of this appeal, we must accept N.K.'s narrative as true and assume that Rivera shot N.K. under the latter circumstances.

Given these facts, the relevant legal question is whether, as of November 16, 2013, our case law put Rivera on fair notice that it is unconstitutional for a police officer to shoot an armed individual after that individual has thrown their weapon to the ground and begun raising their hands, in compliance with officer commands. It did. Indeed, not only is this principle arguably obvious, but also two years before this incident we specifically held in *Bletz v. Gribble* that armed individuals have a "clearly established" "right to be free from deadly police force while complying with police commands to disarm." 641 F.3d 743, 754 (6th Cir. 2011). This was enough to put Rivera on "notice" that his "specific use of force [was] unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

The majority makes three points in response, none of which are convincing.

First, the majority attempts to sidestep *Bletz*'s general holding by adjusting the "clearly established law" lens to a microscopic level. *See* Maj Op. at 8 ("We must . . . inquire whether . . . it was clearly established that it was unconstitutional for an officer to shoot when, over the span of two seconds, someone pulls what appears to be a gun, drops it, and raises his hands after being given a warning."). But this mode of analysis runs afoul of our precedent cautioning panels against being too particular in defining "clearly established" law. *See Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012) ("If it defeats the qualified-immunity analysis to define the right too broadly . . ., it defeats the purpose of § 1983 to define the right too narrowly[.]"). To survive qualified immunity a plaintiff need only point to a "reasonably particularized" constitutional right that the government allegedly violated. *Id*. at 509. The Fourth

Amendment rule laid out in *Bletz* meets that "middle ground" standard. *Id*.; *accord Kent v. Oakland County*, 810 F.3d 384, 396 (6th Cir. 2016) (analogous reasoning).

Second, the majority contends that, even if *Bletz* could provide clearly established law in some other case, its distinguishable facts render it inapplicable here. *See* Maj. Op. at 12. But comparing *Bletz*'s facts to this case's facts show that, if anything, the victim in *Bletz* presented a *greater* threat to the police than 14-year-old N.K. did here—and yet we still denied the officers qualified immunity and allowed the case to proceed to trial. More specifically, in *Bletz*, police officers entered a home late at night to effectuate an arrest warrant, only to find themselves unexpectedly confronted by a man wielding a shotgun. The officers then shot and killed the man on the spot. However, because a fact dispute existed as to whether the man "was lowering his gun in response to [the officers'] command[s]" the moment before he was shot, we ruled that the shooting officer was *not* entitled to qualified immunity as a matter of law. *Id*. at 752. "If [the officer] shot [the plaintiff] while the latter was complying with the officer's command [to disarm]," we held, "then [the officer] violated [the plaintiff's] clearly established Fourth Amendment right to be free from deadly force." *Id*.

Here, by contrast, not only did N.K. not confront Rivera in a dark, close-quarters environment—as the video shows, their entire interaction took place in an uncrowded location in the bright of day—but also Rivera (allegedly) shot N.K. after the young boy had *discarded* his weapon *and* begun raising his hands, per Rivera's commands. That is far worse than *Bletz*, where the officer shot the armed decedent at a moment when the decedent was merely *lowering* his weapon in response to the officers' commands to disarm. As a result, I struggle to understand the majority's contention that *Bletz* cannot provide clearly established law here.

Finally, the majority emphasizes that, even assuming Rivera shot N.K. in the manner N.K. contends he did (which, of course, it should've been doing all along), the fact that N.K. was disarmed does not matter because this case involved a "split-second decision," where Rivera had mere moments to determine if N.K. intended to harm him or not. Maj. Op. at 9. But as we have noted before, "the fact that a situation unfolds relatively quickly does not, by itself, permit [an officer] to use deadly force." *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (citation and quotation marks omitted); *accord Bouggess v. Mattingly*, 482 F.3d 886, 894 (6th Cir. 2007) ("Even a split-second decision, if sufficiently wrong, may not be protected by qualified immunity."). This principle applies with particular force here because again, if the jury agrees with N.K.'s version of events, Rivera shot 14-year-old N.K. *after* he put down his weapon *and* raised his hands, which would suggest that Rivera did not face a life-or-death decision at the moment he pulled the trigger. *See, e.g.*, *Withers v. City of Cleveland*, 640 F. App'x 416, 420–21 (6th Cir. 2016) (analogous reasoning).[2]

For these reasons, I respectfully dissent. This case belongs in front of a jury.

---

[2] *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), cited repeatedly by the majority, is not to the contrary. In that case, a police officer shot and killed a young man in a crowded public place because the young man resisted arrest for nearly two minutes and then unexpectedly pulled a firearm out of his pants and threw it over the officer's head. We granted the officer qualified immunity, despite evidence that the officer had shot the young man a second or two after he hurled the firearm, because the officer "was faced with a rapidly escalating situation" and "a severe threat to himself and the public." *Id*. at 767.

This case is nothing like *Mullins*, as even a cursory comparison of this case's facts and *Mullins*'s facts shows. And, in any event, N.K. has submitted non-speculative evidence that a police officer shot him while he was *raising his hands* in compliance with the officer's order to disarm, thus bringing his case far closer to *Bletz* than to *Mullins*.